**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEIA THOMPSON, *on behalf of herself and all other similarly situated*, | Case No.: |
| Plaintiff, | |
| v. | |
| APEX GLOBAL SOLUTIONS, LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Keia Thompson ("Plaintiff"), on behalf of herself and all others similarly situated ("Class Members") (collectively, the "Class"), files this Class Action Complaint ("Complaint") against Defendant Apex Global Solutions, LLC ("Defendant" or "Apex Global") and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

## INTRODUCTION

1.      Plaintiff brings this class action against Defendant for its failure to safeguard and secure the personally identifiable information ("PII") and protected health information ("PHI", and together with the PII, the "Private Information") in its care.

2.      Apex Global is an IT solutions provider based in New York, specializing in back-office and IT solutions for nursing and long-term care facilities.

3.      In the regular course of its business, Defendant collects, stores, and maintains patients' PII and PHI it receives, but failed to sufficiently secure them.

4.      As a result of Defendant's negligence, cybercriminals were able to gain access to Defendant's systems, which contain data records and sensitive and valuable PII and PHI (the "Data Breach").

5.      On or around July 14, 2024, Defendant became aware of suspicious activity on its network and discovered that an unauthorized third party has accessed certain systems.[1]

6.      Defendant notified affected individuals, including Plaintiff, of the breach in a letter dated June 9, 2025 (the "Notice Letter").[2]  A copy of the Notice Letter sent to Plaintiff is attached hereto as **Exhibit 1**.

7.      In the Notice Letter, Defendant confirmed that files containing Plaintiff's and Class Members' Private Information, including first and last name, date of birth, Social Security number, health insurance information, claims information, patient ID, treatment information, provider name and/or financial account information, had been accessed or acquired during the Data Breach.[3]

8.      Apex Global is an IT solutions provider based in New York. Founded in 2017 through the merger of Apex Healthcare and Global Healthcare Services, Apex Global specializes in back-office and IT solutions for skilled nursing and long-term care facilities.[4] Apex Global

---

[1]  *See* Notice of Data Breach Incident posted on Defendant's website.
https://apexglobalus.com/wp-content/uploads/2025/05/2025-AGS-Notice-of-Data-Incident.pdf
(last visited June 13, 2025).

[2] *See* data breach Notice Letter filed with Vermont Attorney General.
https://ago.vermont.gov/sites/ago/files/documents/2025-06-
10%20Apex%20Global%20Solutions%20Data%20Breach%20Notice%20to%20Consumers.pdf
(last visited June 13, 2025).

[3] *See* Exhibit 1.

[4] Our Story, Apex Global, https://apexglobalus.com/our-story/ (last visited June 13, 2025).

provides services including financial management, purchasing services, HR management, pharmacy cost management, revenue cycle management, and technology services.[5]  Upon information and belief, Apex Global serves healthcare organizations across more than 30 states.[6]

9.    Upon information and belief, the ransomware group known as Brain Cipher has claimed responsibility, stating on their dark web portal that they exfiltrated up to 2 terabytes of data from Apex Global and provided sample screenshots as proof of access.[7]

10.    Upon information and belief, the total number of individuals whose PII and PHI was exposed due to the Data Breach is estimated to be substantial, considering the breadth of data types and Apex Global's multi-state services.

11.    Armed with the PII and PHI accessed in the Data Breach, data thieves can commit a variety of crimes, including opening new financial information in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' health insurance information to submit claims with their insurance provider, using Class Members' health information to get prescription drugs, and using Class Members' PII and PHI to target other phishing and hacking intrusions.

12.    Plaintiff has significant concerns about the security of her personal data. Since the breach, Plaintiff experienced various fraudulent activities, including fraudulent transactions, accounts opened in her name without authorization, credit score decreasing, collection actions

---

[5] Services, Apex Global, https://apexglobalus.com/services/ (last visited June 13, 2025).

[6] Apex Global Solutions Data Breach Disclosure Follows Ransomware Attack, April 27, 2025 https://www.claimdepot.com/data-breach/apex-global-solutions.

[7] *See id.*

taken against her for transactions she did not make, and an increasing number of spam calls and messages.

13.     Defendant owed a non-delegable duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard its PII and PHI against unauthorized access and disclosure. Defendant breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect PII and PHI in its possession from unauthorized access and disclosure.

14.     As a result of Defendant's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class Members' PII and PHI was accessed and disclosed. This action seeks to remedy these failings and the harm caused to Plaintiff and Class Members as a result. Plaintiff brings this action on behalf of herself and all persons whose PII and PHI was exposed because of the Data Breach.

15.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of financial fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

16.     Plaintiff seeks remedies including, but not limited to, compensatory damages, treble damages, punitive damages, reimbursement of out-of-pocket costs, and injunctive relief, including improvements to Defendant's data security system, future annual audits, and fully adequate identity monitoring services funded by Defendant.

17.     Plaintiff, on behalf of herself and other Class Members, asserts claims for negligence, negligence *per se*, breach of contract, breach of fiduciary duty, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, equitable relief, and other relief authorized by law.

## PARTIES

18.      On or around July 14, 2024, Defendant became aware of suspicious activity on its network and discovered that an unauthorized third party had accessed certain systems. Upon investigation, Defendant confirmed that files containing Plaintiff's and Class Members' PII and PHI, including first and last name, date of birth, Social Security number, health insurance information, claims information, patient ID, treatment information, provider name and/or financial account information, had been accessed or acquired.

19.      Plaintiff is a resident of Mercer County, New Jersey. Plaintiff provided her PII and PHI to her healthcare provider, which uses Defendant's services to collect, maintain, and store patient information. Plaintiff received a letter from Defendant, dated June 9, 2025, notifying her that her Private Information was impacted in the Data Breach.

20.      Defendant is a New York limited liability company that maintains its principal place of business located at 400 Rella Blvd. Suite 200, Montebello, New York 10901.

21.      At all relevant times, Plaintiff is and continues to be a member of the Class.

## JURISDICTION AND VENUE

22.      This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2) because (i) there are 100 or more Class Members, (ii) at least one Class Member is a citizen of a state that is diverse from Defendant's citizenship, and (iii) the aggregate matter in controversy exceeds $5,000,000, exclusive of interests and costs.

23.      This Court has general personal jurisdiction over Defendant because Defendant is a citizen of New York. Moreover, Defendant has sufficient minimum contacts in New York, and

Defendant engaged in the conduct underlying this action in New York, including the collection, storage, and inadequate safeguarding of Plaintiff's and Class Members' PII and PHI. Defendant intentionally availed itself of this jurisdiction by marketing and selling products and services and accepting and processing payments for those products and services within New York.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because substantial portion of the acts and transactions that constitute the violations of law complained of herein occurred in Rockland County, New York, and Defendant conducts substantial business in Montebello, within this Judicial District.

## **FACTUAL ALLEGATIONS**

### *Overview of Defendant*

25.    Apex Global specializes in back-office and IT solutions for skilled nursing and long-term care facilities, including financial management, purchasing services, HR management, pharmacy cost management, revenue cycle management, and technology services. Headquartered in Montebello, New York, Apex Global has four additional locations and employs over 530 individuals. Upon information and belief, Apex Global serves healthcare organizations across more than 30 states.[8]

26.    Plaintiff was required to provide her PII and PHI to her healthcare provider, which uses Defendant's services to collect, maintain, and store patient information. To receive and proceed with the healthcare services, Plaintiff and Class Members are required to, and did, provide Defendant directly or indirectly with their sensitive PII and PHI.

---

[8] Apex Global Solutions Data Breach Disclosure Follows Ransomware Attack, April 27, 2025 https://www.claimdepot.com/data-breach/apex-global-solutions.

27.    In its regular course of its business, Defendant collects, stores, and maintains the PII and PHI it receives from Plaintiffs and Class Members.

28.    By creating and maintaining massive repositories of PII and PHI, Defendant has provided a particularly lucrative target for data thieves looking to obtain, misuse, or sell such data.

### Data Breach and Notice Letter

29.    On or around July 14, 2024, Defendant became aware of the Data Breach, and that it was a target of a ransom attack.

30.    Over 8 months later, on or around March 17, 2025, Defendant finally concluded its internal investigation on the Data Breach. Defendant again waited until June 9, almost 3 months after the conclusion of the investigation, to notify Data Breach victims.

31.    In June 2025, Plaintiff received a letter from Defendant, dated June 9, 2025, notifying her that her Private Information was impacted in the Data Breach.

32.    While Defendant claims in its Notice Letter that it takes "the privacy of information in [its] care seriously," Defendant failed to do so. Specifically, while Defendant offers complimentary identity protection services, it places the burden on Data Breach victims to reach out to the service provider to resolve fraudulent activities with limited instructions, and a tight deadline to enroll by September 9, 2025, within 3 months from the date of the notice letter.[9]

33.    Upon information and belief, the ransomware group known as Brain Cipher has claimed responsibility, stating on their dark web portal that they exfiltrated up to 2 terabytes of data from Apex Global and provided sample screenshots as proof of access.

---

[9] *See* Exhibit 1.

34.    Upon information and belief, the total number of individuals whose PII and PHI was exposed due to the Data Breach is estimated to be substantial, considering the breadth of data types and Apex Global's multi-state services.

35.    To date, Defendant has not disclosed crucial information, including, but not limited to, the identity of the hacking group responsible for the Data Breach, how the cybercriminals were able to exploit vulnerabilities in Defendant's IT security systems, or any steps taken by Defendant to safeguard its systems meeting the standard of specificity expected from Data Breach victims.

36.    Upon information and belief, Defendant's inadequate cybersecurity measures, failure to properly train employees, and failure to monitor systems allowed the Data Breach to occur.

37.    Defendant failed to detect and stop the Data Breach in a timely manner and delayed notifying affected individuals about the incident. Although Defendant became aware of the Data Breach on or around July 14, 2024, Defendant did not begin posting notifications about the Data Breach to its website until June 9, 2025, almost a year later.

38.    As a result of the Data Breach, Plaintiff's and Class Members' PII and PHI are exposed to unauthorized individuals, placing them at risk of identity theft and other financial harm.

39.    As a result of the Data Breach, Plaintiff and Class Members suffered ascertainable losses from the loss of the value in their private and confidential information, loss of the benefit of their contractual bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

40.    Plaintiff and Class Members have and will continue to incur out-of-pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

41.     Defendant's actions, including the delayed notification of the Data Breach and the significant lag in investigation, caused additional harm to Plaintiff and Class Members by limiting their ability to take immediate steps to protect themselves from identity theft.

42.     Defendant did not use reasonable security procedures to safeguard the sensitive information of Plaintiff and Class Members.

43.     Defendant's systems hacked by cybercriminals contained Plaintiff's and Class Members' PII and PHI that was accessible, unencrypted, unprotected, and vulnerable to acquisition and/or exfiltration by the unauthorized actor.

44.     Plaintiff and Class Members provided their PII and PHI to Defendant, directly or indirectly, as instructed by their healthcare provider, with the reasonable expectation and mutual understanding that Defendant would comply with its obligation to keep such information confidential and secure from unauthorized access.

45.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII and PHI, Defendant assumed legal and equitable duties and knew, or should have known, that it was responsible for protecting Plaintiff's and Class Members' PII and PHI from unauthorized disclosure.

### *Defendant Knew That Criminals Target PII and PHI*

46.     In its regular course of business, Defendant accumulates highly private PII and PHI of Plaintiff and Class Members, directly or indirectly.

47.     In collecting and maintaining its PII and PHI, Defendant owed a non-delegable duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII and PHI against unauthorized access and disclosure.

48.     Cyber-attacks against healthcare organizations, such as Defendant, are targeted. According to the 2023 Health Information Management Systems Society, Inc. ("HIMMS") Cybersecurity Survey, "[r]ansomware attacks are often state-sponsored and highly organized and sophisticated. Since as early as 2018, healthcare organizations have been concerned about ransomware attacks. 2023 was no exception, as the number of ransomware leak sites divulging sensitive information, such as patient information, have greatly increased."[10] Hospitals have "emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From Social Security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[11]

49.     Defendant had obligations created by Health Insurance Portability and Accountability Act ("HIPAA"), contract, industry standards, common law, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

50.     As an IT service provider specializing in healthcare, Defendant understood the need to protect the PII and PHI it collects and maintains, and to prioritize its data security. In particular, Defendant was fully aware of and understood the need to protect the PII and PHI of the patients and associated individuals.

---

[10] *2023 HIMSS Healthcare Cybersecurity Survey*, HIMSS 13, https://gkc.himss.org/sites/hde/files/media/file/2024/03/01/2023-himss-cybersecurity-survey-x.pdf (last visited June 13, 2025).

[11] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, CHIEF HEALTHCARE EXEC., https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks (Apr. 4, 2019).

51.     Despite its acknowledged duty, Defendant failed to implement adequate cybersecurity safeguards and policies to protect the Private Information of Plaintiff and Class Members. Defendant did not properly train its IT or data security staff to prevent, detect, or stop breaches, leaving its systems vulnerable to exploitation by cybercriminals.

52.     PII and PHI is of great value to hackers and cybercriminals, and the data comprised in the Data Breach can be used in variety of unlawful manners.

53.     PII and PHI can be used to distinguish, identify, or trace an individual's identity, such as name, Social Security number, and medical records. This can be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as birthdate, birthplace, and mother's maiden name.

54.     Given the nature of this breach, it is foreseeable that the compromised PII and PHI can be used by hackers and cybercriminals in a variety of different ways.

55.     Indeed, cybercriminals who possess Class Members' PII and PHI can easily obtain Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

56.     In the wake of the significant rise in data breaches, the Federal Trade Commission has also issued an abundance of guidance for companies and institutions that maintain individuals' PII.[12]

57.     As a result of the notoriety of cyberattacks on systems like Defendant's, several other government entities have also issued warnings to potential targets so that they may be alerted and prepared for a potential attack, like the Data Breach.

---

[12] *See, e.g.*, *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N., https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last visited June 13, 2025).

58.     In light of the high-profile data breaches in similar industries and large businesses, and a wealth of relevant guidance and news reports available to Defendant, as an IT service provider specializing in healthcare business, Defendant knew or should have known that cybercriminals would target its electronic records and PII and PHI in its possession.

59.     These data breaches have been a consistent problem for the past several years, providing Defendant sufficient time and notice to improve the security of its systems and engage in stronger, more comprehensive cybersecurity practices.

60.     PII/PHI is a valuable property right.[13]  The value of PII/PHI as a commodity is measurable.[14]  "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[15]  American companies are estimated to have spent over $19 billion acquiring consumers' personal data in 2018.[16]  In fact, PII/PHI are so valuable to identity thieves that once disclosed, criminals often trade it on the cyber black-market, or the dark web, for many years.

---

[13] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFO. AND COMMC'N. TECH. 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . .").

[14] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

[15] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[16] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

61.     As a result of its real value and the recent large-scale data breaches, identity thieves and cybercriminals have openly posted credit card numbers, Social Security numbers, and other PII/PHI directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

62.     Consumers place a high value on the privacy of their PII.  Researchers shed light on how much consumers value their data privacy — and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[17]

63.     Given these factors, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

64.     Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

65.     Accordingly, Defendant clearly knew or should have known of the risks of data breaches and thus should have ensured that adequate protections were in place, particularly given the nature of the PII and PHI stored in its unprotected files and the massive amount of PII and PHI it maintains.

66.     Equally, at all relevant times, Defendant knew or should have known that Plaintiff's and all other Class Members' PII and PHI were targets for malicious actors.

---

[17] Janice Y. Tsai, et al., *The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

### *Theft of PII and PHI has Grave and Lasting Consequences for Victims*

67.    Data breaches are more than just technical violations of their victims' rights.  By accessing a victim's personal information, the cybercriminal can ransack the victim's life: withdraw funds from bank accounts, get new credit cards or loans in the victim's name, lock the victim out of their financial or social media accounts, send out fraudulent communications masquerading as the victim, file false tax returns, destroy their credit rating, and more.[18]

68.    Plaintiff and Class Members who have fallen victim to a data breach suffer real harms.[19]

69.    Data breaches represent a significant problem for victims who have already experienced the inconvenience and disruption associated with a cyber-attack.

70.    Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[20]  In addition, identity thieves may obtain a job using the victim's Social Security Number, rent a house, or receive medical

---

[18] *See* Laura Pennington, *Recent Data Breach Trends Mean Your Info Was Likely Stolen Last Year*, TOP CLASS ACTIONS (Jan. 28, 2019), https://topclassactions.com/lawsuit-settlements/privacy/data-breach/875438-recent-data-breach/.

[19] Ying Hu, *Mainstreaming Unjust Enrichment and Restitution in Data Security Law*, 13 U.C. IRVINE L. REV. 855, 872 (2023) ("Plaintiff who have fallen victim to a data breach suffer real harms. There is a higher chance that their personal data will be used against their interests: wrongdoers might use that data to locate and injure them….").

[20] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h).  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official state or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."  12 C.F.R. § 1022.3(g).

services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[21]

71.    Identity theft victims are frequently required to spend many hours and large sums of money repairing the adverse impact on their credit.

72.    As the United States Government Accountability Office noted in a June 2007 report on data breaches ("GAO Report"), identity thieves use identifying data such as Social Security numbers to open financial accounts, receive government benefits, and incur charges and credit in a person's name.[22]  As the GAO Report states, this type of identity theft is more harmful than any other because it often takes time for the victim to become aware of the theft, and the theft can adversely impact the victim's credit rating.

73.    In addition, the GAO Report states that victims of this type of identity theft will face "substantial costs and inconveniences repairing damage to their credit records" and their "good name."[23]

74.    The value of sensitive information is axiomatic; one need only consider the value of Big Data in corporate America, or that the consequences of cyber theft include heavy prison sentences.  Even the obvious risk to reward analysis of cybercrime illustrates beyond doubt that Private Information has considerable market value.

---

[21] *See Warning Signs of Identity Theft*, FED. TRADE COMM'N, https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last visited June 13, 2025).

[22] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOV'T ACCOUNTABILITY OFF. (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[23] *Id.* at 2, 9.

75.     Theft of PHI is particularly problematic because: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care.  If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[24]

76.     Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

77.     There may be a time lag between when PII is stolen and when it is used.[25]  According to the GAO Report:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[26]

Such personal information is such a crucial commodity to identity thieves that once the information has been compromised, criminals often trade it on the "cyber black-market" for years. As a result

---

[24] *See Medical Identity Theft*, Federal Trade Commission Consumer Information http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited June 13, 2025).

[25] For example, on average, it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.  John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9, 12 (2019), https://www.iiisci.org/Journal/PDV/sci/pdfs/IP069LL19.pdf.

[26] U.S. GOV'T ACCOUNTABILITY OFF., *supra* note 34 (emphasis added).

of recent large-scale data breaches, identity thieves and cybercriminals have openly posted stolen credit card numbers, Social Security numbers, and other PII directly on various internet websites, making the information publicly available.

78.     Due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII (*e.g.*, name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who companies employ to find flaws in their computer systems, stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[27]

79.     Medical information is especially valuable to identity thieves. The asking price on the Dark Web for medical data is $50 and up.[28]

80.     Because of its value, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

81.     Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft, and some need over a year.[29]

---

[27] Patrick Lucas Austin, *'It is Absurd.' Data Breaches Show It's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019, 3:39 P.M.), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[28] *See* Omri Toppol, *Email Security: How You Are Doing It Wrong & Paying Too Much*, LogDog (Feb. 14, 2016), https://getlogdog.com/blogdog/email-security-you-are-doing-it-wrong/ (last accessed December 10, 2020).

[29] *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, Their Families, Friends and Workplaces*, IDENTITY THEFT RES. CTR., https://efraudprevention.com/pub/ITRC_2021_Consumer_Aftermath_Report.pdf (last visited June 13, 2025).

82.    Plaintiff and Class Members must vigilantly monitor their financial accounts and their family members' accounts for many years to come.

83.    It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market. Plaintiff and all other Class Members have suffered injury and damages, including, but not limited to (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face.

### Damages Sustained by Plaintiff and the Other Class Members

84.    Plaintiff is very careful about sharing her sensitive PII/PHI. Plaintiff has never knowingly transmitted unencrypted PII/PHI over the internet or any other unsecured source.

85.    Because of the Data Breach, Defendant directed Plaintiff to take certain steps to protect her PII/PHI and otherwise mitigate her damages.

86.    Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent self-monitoring financial accounts, mitigating collection actions taken against her for transactions she did not make, and correcting her credit reports. This time has been lost forever and cannot be recaptured. And this time was spent at

Defendant's direction by way of the Data Breach notice where Defendant recommended that Plaintiff mitigate her damages by, among other things, monitoring her accounts for fraudulent activity.

87.     Plaintiff suffered emotionally over the stress resulting from the Data Breach and her substantially increased risk of identity theft, such as the possibility of criminals using her PII/PHI to open bank accounts or commit other frauds.

88.     Plaintiff suffered actual injury resulting from the Data Breach. Since the Data Breach, Plaintiff has experienced various fraudulent activities, including fraudulent transactions made to Dish Network, Xfinity and Amazon that she never authorized, accounts opened in her name for cable services without authorization, credit score decreasing, collection actions taken against her for transactions she did not make, and an increasing number of spam calls and messages.

89.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of Plaintiff's PII/PHI that Plaintiff entrusted to Defendant, which was compromised because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, insecurity, and inconvenience because of the Data Breach and has increased concerns for the loss of her privacy.

90.     Plaintiff and other Class Members have suffered injury and damages, including but not limited to Data breaches are more than just technical violations of their victims' rights.  By accessing a victim's personal information, the cybercriminal can ransack the victim's life: withdraw funds from bank accounts, get new credit cards or loans in the victim's name, lock the

victim out of their financial or social media accounts, send out fraudulent communications masquerading as the victim, file false tax returns, destroy their credit rating, and more.[30]

91.     As a result, Plaintiff and all other Class Members have suffered injury and damages, including, but not limited to (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face.

92.     Furthermore, Defendant has failed to provide adequate compensation to Plaintiff and Class Members harmed by its negligence. To date, Defendant has offered Plaintiff and Class Members a complimentary credit monitoring service that is available for a limited time period. More devastating is that this complimentary monitoring service will be rendered unusable unless Plaintiff and Class Members enroll within 3 months from the date each Notice Letter was sent to them. Even if affected individuals accept the credit monitoring service, it will not provide them with any compensation for the costs and burdens associated with fraudulent activity resulting from the Data Breach that took place prior to signing up for the service. Defendant has not offered Class Members any assistance in dealing with the IRS or state tax agencies. Nor has Defendant offered

---

[30] *See* Laura Pennington, *Recent Data Breach Trends Mean Your Info Was Likely Stolen Last Year*, TOP CLASS ACTIONS (Jan. 28, 2019), https://topclassactions.com/lawsuit-settlements/privacy/data-breach/875438-recent-data-breach/.

to reimburse Plaintiff and Class Members for any costs incurred as a result of falsely filed tax returns, a common consequence of data breaches.

93.     The offered credit monitoring service is inadequate to protect Class Members from the threats they face. It does nothing to protect against identity theft. Instead, it only provides various measures to identify identity theft once it has already been committed.

94.     The offered credit monitoring services are also wholly inadequate in that they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PII and PHI.

95.     Yet, Defendant has failed to provide transparency regarding the cause of the Data Breach, instead placing the burden on Plaintiff and Class Members to address the issue themselves.

## CLASS ACTION ALLEGATIONS

96.     This action is brought and may be properly maintained as a class action pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure.

97.     Plaintiff proposes the following Class definition(s), subject to amendment based on information obtained through discovery. Notwithstanding, at this time, Plaintiff brings this action on behalf of herself and all members of the following Class of similarly situated persons:

> **All individuals whose PII and PHI was accessed by unauthorized persons as a result of the Data Breach.**

98.     Plaintiff reserves the right to amend the above definition or to propose other or additional classes in subsequent pleadings and/or motions for class certification.

99.     Plaintiff is a member of the Class.

100.     Excluded from the Class are Defendant, its affiliates, parents, subsidiaries, officers, agents, directors, the judge(s) presiding over this matter, and the clerks of said judge(s).

101.     This action seeks both injunctive relief and damages.

102.     Plaintiff and the Class satisfy the requirements for class certification for the following reasons set forth below.

103.     **Numerosity of the Class.**  The members in the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. While the exact number of Class Members is unknown at this time, Class Members are readily identifiable in Defendant's records, which will be a subject of discovery. Upon information and belief, there are thousands of Class Members in the Class.[31]

104.     **Common Questions of Law and Fact.**  There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including:

   a.     Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII and PHI;
   b.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
   c.     Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;
   d.     Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;
   e.     Whether Defendant owed a duty to Class Members to safeguard their PII and PHI;
   f.     Whether Defendant breached its duty to Class Members to safeguard their PII and PHI;
   g.     Whether criminals obtained Class Members' PII and PHI in the Data Breach;
   h.     Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

---

[31] *See supra ¶¶* 8-10.

i.    Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.    Whether Defendant owed a duty to provide Plaintiff and Class Members notice of the Data Breach, and whether Defendant breached that duty;

k.    Whether Defendant's conduct was negligent;

l.    Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

m.    Whether Plaintiff and Class Members are entitled to damages, treble damages, civil penalties, punitive damages, and/or injunctive relief.

105.    **Typicality.** The claims or defenses of Plaintiff are typical of the claims or defenses of the proposed Class because Plaintiff's claims are based upon the same legal theories and violations of law. Plaintiff and Class Members all had their PII and PHI stolen in the Data Breach. Plaintiff's grievances, like the proposed Class Members' grievances, all arise out of the same business practices and course of conduct by Defendant.

106.    **Adequacy of Representation.** Plaintiff will fairly and adequately represent the Class on whose behalf this action is prosecuted. Her interests do not conflict with the interests of the Class.

107.    Plaintiff and her chosen attorney – Finkelstein & Partners,LLP and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP ("Plaintiff's Counsel") – are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this Complaint. In particular, Plaintiff's Counsel have been appointed as lead counsel in several complex class actions across the country and has secured numerous favorable judgments in favor of its clients, including in cases involving data breaches. Plaintiff's Counsel are competent in the relevant areas of the law and has sufficient experience to vigorously represent Plaintiff and Class Members. Finally, Plaintiff's Counsel possess the financial resources necessary to ensure that a lack of financial capacity will not hamper the litigation and is willing to absorb the costs of the litigation.

108.     **Predominance.**  The common issues identified above arising from Defendant's conduct predominate over any issues affecting only individual Class Members. The common issues hinges on Defendant's common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of herself and all other Class Members.  Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

109.     **Superiority.**  A class action is superior to any other available method for adjudicating this controversy.  The proposed class action is the surest way to fairly and expeditiously compensate such a large number of injured persons, to keep the courts from becoming paralyzed by hundreds—if not thousands—of repetitive cases, and to reduce transaction costs so that the injured Class Members can obtain the most compensation possible.

110.     Class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation for many reasons, including the following:

a.     It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions. Many members of the Class are not in the position to incur the expense and hardship of retaining their own counsel to prosecute individual actions, which, in any event, might cause inconsistent results.

b.     When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Class. This will promote global relief and judicial efficiency in that the liability of Defendant to all Class Members, in terms of monetary damages due and terms of equitable relief, can be determined in this single proceeding rather than in multiple individual proceedings where there will be a risk of inconsistent and varying results.

c.     A class action will permit an orderly and expeditious administration of the Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions.  If Class Members are forced to bring individual suits, the transactional costs, including those incurred by Defendant, will increase dramatically, and the courts will be clogged with a multiplicity of lawsuits concerning the very same subject matter, with identical fact patterns and the same legal issues.  A class action will promote a global resolution and will promote uniformity of relief to Class Members and Defendant.

d.    This lawsuit presents no difficulties that would impede its management by the Court as a class action. The class certification issues can be easily determined because the Class includes only current, former, and prospective patients of Defendant and individuals associated with their matters, directly or indirectly, the legal and factual issues are narrow and easily defined, and Class Membership is limited. The Class does not contain so many persons that would make thecClass notice procedures unworkable or overly expensive. The identity of Class Members can be identified from Defendant's records, such that direct notice to Class Members would be appropriate.

111.    **Injunctive Relief.** Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final injunctive or equitable relief on a class-wide basis.

## CAUSES OF ACTIONS

### COUNT 1
### NEGLIGENCE
### (ON BEHALF OF PLAINTIFF AND CLASS MEMBERS)

112.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

113.    As requested by Defendant in relation to its legal proceedings, Plaintiff and Class Members provided Defendant with their PII and PHI, directly or through their healthcare provideres.

114.    By collecting and storing their PII and PHI, at all times relevant, Defendant owed a duty to Plaintiff and all other Class Members to exercise reasonable care in safeguarding and protecting their Private Information in their possession, custody, or control.

115.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with statutory and industry standards and to ensure that its systems and networks and the personnel responsible for them adequately protected PII and PHI.

116.    Defendant knew the risks of collecting and storing Plaintiff's and all other Class Members' PII and PHI and the importance of maintaining secure systems. Defendant knew of the many data breaches that targeted companies that store PII and PHI in recent years.

117.    Given the nature of Defendant's business, the sensitivity and value of PII and PHI Defendant maintains, and the resources at its disposal, Defendant should have identified the vulnerabilities in its systems and prevented the Data Breach from occurring.

118.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant, as a service provider and business associate to healthcare organizations, and the patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as the common law.  Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from the Data Breach.

119.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to reasonably protect confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information."  45 C.F.R. § 164.530(c)(1), (2).

120.    Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA. 45 C.F.R. § 164.530(b)(1)

121.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

122.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

123.    According to the University of Illinois Chicago (UIC), "protecting health information (PHI) from cyberattacks is vital."[32]

124.    UIC has identified several strategies and best practices that, at a minimum, should be implemented by healthcare providers like Defendant, including but not limited to: "[e]ncrypting data ensures that even if data is breached, it cannot be read without the decryption key," "[i]mplementing strict access controls helps ensure that only authorized personnel can access sensitive information," "[c]ontinuous monitoring and regular audits can help detect unusual activities and potential breaches early,  and "[e]ducating employees about best practices and how to recognize phishing attempts can reduce the risk of human error."[33]

125.    A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards. The Center for Internet Security (CIS) released its Critical Security Controls, and all healthcare institutions are strongly advised to follow these guidelines.[34]

126.    Other cybersecurity best practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network

---

[32] *Healthcare Cybersecurity: Health Informatics Safeguards Patient Data*, UNIV. OF ILL. CHIC., https://healthinformatics.uic.edu/news-stories/healthcare-cybersecurity-safeguard-patient-data/ (last visited June 13, 2025).

[33] *Id.*

[34] *CIS Benchmarks™ FAQ*, CTR. FOR INTERNET SEC., https://www.cisecurity.org/cis-benchmarks/cis-benchmarks-faq/ (last visited June 13, 2025).

ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and the protection of physical security systems; protecting against any possible communication system; and training staff regarding critical points.

127.    Upon information and belief, Defendant failed to meet the minimum standards of both the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness.

128.    Defendant breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it, including Plaintiff's and Class Members' PII and PHI.

129.    Plaintiff and Class Members are a well-defined, foreseeable, and probable group of current, former, and prospective patients and individuals associated with their matters that Defendant were aware, or should have been aware, could be injured by inadequate data security measures.

130.    Plaintiff and Class Members have no ability to protect their PII and PHI that was or remains in Defendant's possession.

131.    It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data

security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' PII and PHI to unauthorized individuals.

132.    But for Defendant's negligent conduct and breach of the above-described duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

133.    Defendant's conduct was negligent and departed from reasonable standards of care, including but not limited to failing to adequately protect Plaintiff's and Class Members' PII and PHI and failing to provide them with timely notice that their Private Information had been compromised.

134.    Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their PII and PHI, as described in this Complaint.

135.    By failing to provide timely and complete notification of the Data Breach to Plaintiff and Class Members, Defendant prevented them from proactively taking steps to secure their PII and PHI and mitigate the associated threats.

136.    As a result of Defendant's above-described wrongful actions, inaction, and lack of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class Members have suffered and will continue to suffer economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII and PHI; (iii) breach of the confidentiality of their PII and PHI; (iv) deprivation of the value of their PII and PHI, for which there is a well-established national and international market; (v) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their

PII and PHI; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT II
## NEGLIGENCE *PER SE*
## (ON BEHALF OF PLAINTIFF AND CLASS MEMBERS)

137.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

138.    Defendant had duties by statute to ensure that all information it collected and stored was secure and that it maintained adequate and commercially reasonable data security practices to ensure the protection of Plaintiff's and Class Members' PII and PHI.

139.    Defendant' duties arise from, *inter alia*, Section 5 of the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45(a)(1) ("FTCA"), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Defendant, of failing to employ reasonable measures to protect and secure PII/PHI.

140.    The FTC has published numerous guides for businesses that highlight the importance of implementing reasonable data security practices. In 2016, the FTC updated its publication establishing cybersecurity guidelines for businesses, which makes thorough recommendations, including, but not limited to, for businesses to protect the personal customer information they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[35]

---

[35] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

141.    Furthermore, businesses maintaining health information must ensure "health data practices ae not substantially injuring consumers, including by invading their privacy." [36] In fact, FTC is taking high priority in protecting consumers' protected health information spanning treatments, diagnoses to any health information that enables an inference about consumer's health.[37]

142.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA. Orders resulting from these actions further clarify the measures businesses such as Defendant must take to meet their data security obligations and effectively put Defendant on notice of these standards.

143.    Defendant violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all Class Members' PII and PHI and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI, including, specifically, the substantial damages that would result to Plaintiff and other Class Members.

144.    Defendant's violation of the FTCA constitutes negligence *per se*.

---

[36] *Collecting, Using, or Sharing Consumer Health Information? Look to HIPAA, the FTC Act, and the Health Breach Notification Rule*, FED. TRADE COMM'N, https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach (last visited June 13, 2025).

[37] *See id.*

145.    Plaintiff and Class Members are within the class of persons that Section 5 of the FTCA was intended to protect.

146.    The harm occurring as a result of the Data Breach is the type of harm against which Section 5 of the FTCA was intended to guard.

147.    It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' PII and PHI to unauthorized individuals.

148.    The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Defendant's violation of Section 5 of the FTCA.  Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia: (i) a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII and PHI; (iii) breach of the confidentiality of their PII and PHI; (iv) deprivation of the value of their PII and PHI, for which there is a well-established national and international market; (v) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face. Defendant's violation of the FTCA constitutes negligence *per se* for purposes of establishing the duty and breach elements of Plaintiff's negligence claim. Those statutes were designed to protect

a group to which Plaintiff belongs and to prevent the type of harm that resulted from the Data Breach.

149.    Defendant owed a duty of care to Plaintiff and other Class Members because they were foreseeable and probable victims of any inadequate security practices.

150.    It was foreseeable that Defendant's failure to use reasonable measures to protect PII/PHI and provide timely notice of the Data Breach would result in injury to Plaintiff and other Class Members.  Further, the breach of security, unauthorized access, and resulting injury to Plaintiff and other Class Members were reasonably foreseeable.

151.    It was therefore foreseeable that the failure to adequately safeguard PII and PHI would result in one or more of the following injuries to Plaintiff and other Class Members: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the deep web black market; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

<u>COUNT III</u>
**<u>BREACH OF THIRD-PARTY BENEFICIARY CONTRACT</u>**
**<u>(ON BEHALF OF PLAINTIFF AND CLASS MEMBERS)</u>**

152.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

153.    Defendant entered into written contracts with its customers, healthcare providers of Plaintiff and Class Members, to perform services that include, but are not limited to, computer software technology services.

154.    The contracts were made in part for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contract entered into between Defendant and the healthcare providers.  Indeed, Defendant knew that if it were to breach the contract, its customers' patients, including Plaintiff and Class Members, would be harmed by, among other things, fraudulent misuse of their PII/PHI.

155.    It was intended by Defendant at the time the contracts were made that Defendant would assume a direct obligation to protect Plaintiff's and the Class's PII/PHI.

156.    It was also intended by Defendant that the performance under the contract would necessarily and directly benefit Plaintiff and the Class.  Defendant would utilize the PII/PHI it collected in providing timely and accurate computer software technology services for Plaintiff and Class Members, on behalf of its customers.

157.    Defendant breached its obligations under its contracts, to which Plaintiff and Class Members are intended beneficiaries, directly resulted in the Data Breach and the injuries that Plaintiff and all other Class Members have suffered.

158.    As a direct and proximate result of Defendants' breach of implied contracts, Plaintiff and all other Class Members suffered and will continue to suffer damages, because (i) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) their PII/PHI was improperly disclosed to unauthorized individuals; (iii) the confidentiality of their PII/PHI has been breached; (iv) they were deprived of the value of their PII/PHI, for which there is a well-established

national and international market; and (v) lost time and money incurred, and future costs required, to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
### (ON BEHALF OF PLAINTIFF AND CLASS MEMBERS)

159.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

160.    In providing their Private Information to Defendant, Plaintiff and Class Members justifiably placed special confidence in Defendant to act in good faith and with due regard to interests of Plaintiff and Class Members to safeguard and keep confidential that Private Information.

161.    Defendant accepted the special confidence placed in it by Plaintiff and Class Members.  There was an understanding between the parties that Defendant would act for the benefit of Plaintiff and Class Members in preserving the confidentiality of their Private Information.

162.    In light of the special relationship between Defendant, Plaintiff, and Class Members, whereby Defendant became the guardian of Plaintiff's and Class Members' Private Information, Defendant accepted a fiduciary duty to act primarily for the benefit of Plaintiff and Class Members. This duty included safeguarding Plaintiff's and Class Members' Private Information.

163.    Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with the patients, in particular, to keep secure Private Information of those patients.

164.     Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, or give notice of the Data Breach in a reasonable and practicable period of time.

165.     Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of its computer systems containing Plaintiff's and Class Members' Private Information.

166.     Defendant breached the fiduciary duties it owed to Plaintiff and Class Members by failing to timely notify and/or warn them of the Data Breach.

167.     Defendant breached its fiduciary duties by otherwise failing to safeguard Plaintiff' and Class Members' Private Information.

168.     As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the

lives of Plaintiff and Class Members; and (vii) the diminished value of Defendant's services they received.

169.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT V**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFF AND CLASS MEMBERS)**

170.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

171.    This claim is pleaded in the alternative to the foregoing causes of actions.

172.    Defendant, by way of its acts and omissions, knowingly and deliberatively enriched themselves by saving the costs they reasonably should have expended on security measures to secure Plaintiff's and Class Members' PII and PHI.

173.    Instead of providing for a reasonable level of security that would have prevented the Data Breach—as is common practice among companies entrusted with such PII and PHI— Defendant instead consciously and opportunistically calculated to increase its own profits at the expense of Plaintiff and Class Members.

174.    Nevertheless, Defendant continued to obtain the benefits conferred on them by Plaintiff and Class Members.

175.    Plaintiff and Class Members, on the other hand, suffered harm as a direct and proximate result. As a result of Defendant's decision to profit rather than provide requisite security, and the resultant Data Breach disclosing Plaintiff's and Class Members' PII and PHI, Plaintiff and Class Members suffered and continue to suffer considerable injuries in the forms of, *inter alia*,

attempted identity theft, time and expenses mitigating harms, diminished value of Private Information, loss of privacy, and increased risk of harm.

176.     Thus, Defendant engaged in opportunistic conduct in spite of their duties to Plaintiff and Class Members, wherein it profited from interference with Plaintiff's and Class Members' legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its conduct.

177.     Accordingly, Plaintiff, on behalf of herself and Class Members, respectfully request this Court award relief in the form of restitution and/or compensatory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class;

B.     For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from failing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.     For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII and PHI compromised during the Data Breach;

D.     For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.     Ordering Defendant to pay for not less than three years of credit monitoring services for Plaintiff and Class Members;

F.     For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.     For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

H.     Pre- and post-judgment interest on any amounts awarded; and

I.     Such other and further relief as this court may deem just and proper, including additional protections for Plaintiff and Class Members.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: June 13, 2025                    Respectfully Submitted,


                                        Todd S. Garber
                                        **FINKELSTEIN, BLANKINSHIP**
                                        **FREI-PEARSON & GARBER, LLP**
                                        One North Broadway, Suite 900
                                        White Plains, New York 10601
                                        Tel.: (914) 298-3281
                                        tgarber@fbfglaw.com

                                        Matthew R. Mendelsohn
                                        **MAZIE SLATER KATZ & FREEMAN, LLC**
                                        103 Eisenhower Parkway
                                        Roseland, NJ 07068
                                        Tel: 973-228-9898
                                        mrm@mazieslater.com

                                        Joseph M. Adams  (pro hac vice forthcoming)
                                        **LAW OFFICE OF JOSEPH M. ADAMS**
                                        200 Highpoint Drive, Suite 211A
                                        Chalfont, PA  18914
                                        Tel: 215-996-9977
                                        josephmadamsesq@verizon.net

                                        *Attorneys for Plaintiff and the Proposed Class*